5-13-535 Kubler v. Kubler Counselor ready? The police court, Justice Welch, Mr. Periani, the first issue we have in this, when I represent Tommy Kubler, this was a divorce from Madison County, the first issue we have is an issue for this court to decide on a de novo basis having to do with a scrivener's error. And these don't come up too often, but this one's actually pretty interesting. To give you a little background on it, the question here is what is, was it a correction of clerical error or was it the exercise of judicial function? And I think it's interesting to think about this, because it's not just a matter of   It's a matter of the statute in the statute, and I think it's interesting to think about it. And so, we have a trial, a couple of days, and a judgment was entered on March the 5th. Mrs. Kubler files a post-trial motion. In that post-trial motion, she didn't raise any question about this account, 8479, which was an IRA that Tommy had had before the marriage and he also contributed to during the marriage. She raised a number of issues in her post-trial motion, but nothing having to do with this   And in the order, the trial judge wrote, the court notes that this finding is substantially different from the judgment of dissolution issued May 5th, 2012. In the judgment, he had found that during the time that the parties were married, Tommy was in the Air Force. He was contributing to this IRA by allotment, and during the marriage, those allotment shares purchased would be marital property subject to being divided. In the initial ruling, he found that there were 981 shares. Tommy didn't dispute that, and as I say, it didn't go up on appeal. But then, two years later, by the time the order was actually issued, he multiplies that by a factor of 10, and suddenly now they're dividing almost 10,000 shares from this account. We've cited a couple of cases in the brief. Dahlman, that you correct the record of judgment, that you can correct the record of judgment, but not alter the judgment actually rendered. And the Gingers case, that the correction must be based on some note or memorial paper remaining in the file. It cannot be based on the recollection of the trial judge. The exhibit in the file that relates to this account and the contributions during the marriage was our exhibit 18, which were the yearly statements from this investment. It was Invesco, it was the company. And every year, they'd issue a statement, January through December, this is how many were purchased, and it was an automatic deduction allotment from his leave and earnings statement that he paid every year for about eight years. And the best calculation we can make from that is it might have been 1,000 shares rather than 981 shares, but there was no evidence to show that 10,000 shares were purchased during the marriage. I think the best case that we've submitted on this one is in our yellow brief. We're very colorful in this one because we have cross appeals and replies. But this is our reply brief. In going back through it, I identified a December of 2012 case from the first district that dealt with correcting mathematical conclusions or findings in a judgment. And the primary case there is a .1 Toyota case that basically the trial judge made a calculation as to attorney's fees, and then he later went back in after the jurisdiction had expired and corrected the scrivener's error and recalculated the attorney's fees. And the court in that case, relying on marriage of Takata, said you can't do that. And Takata, what the judge had done, is made a mathematical error in calculating Mr. Takata's statutory net income for child support, and then went back in and recalculated that as a scrivener's error. And in those cases, it was found that that was the exercise of a judicial function, not a correction of a scrivener's error. And I think that's exactly what we have here. The judge even acknowledges in his order that this is a substantial change in the judgment. To go from 900 shares to 9,000 shares is not like putting in a comma or some of the other case examples of what a scrivener's error would be. And I think because it was not taken up in the initial post-trial motion, the court lost jurisdiction and had no authority to make that change. On the 8479 account that's related to this, I think there's also a secondary argument, and that is that the best evidence, or the only evidence, was our Exhibit 18 that shows no more than 1,000 shares purchased during the marriage, so there was no basis for the evidence contrary to the manifest way that the evidence would constitute the abuse of the trial court's discretion. The other issue we have that's pretty complicated is a house in Florida. It's not disputed that prior to Tommy's marriage to Diane, he purchased and owned a house in Florida. He was then in the Air Force down near Pensacola. After they were married, he refinanced the house twice to get better interest rates, and the evidence was the second refinancing, Diane's name was added to the loan. We have a whole line of cases that deal with you own a house before the marriage, you get married, and you refinance it and put the wife's name on the deed, and that's a gift to the marital estate, no question about that. What's important here is there was no evidence that her name was ever placed on the deed, and I've not found any cases that say putting someone on a mortgage is sufficient to transmute the property from clearly non-marital to marital. And in terms of the financial issues, this house was a rental house, they weren't living in it, so for 20 years it was a rental house, so there's no question about marital money going into it because it was a house that was generating a positive cash flow. There was no deed admitted into evidence, is that correct? There was not. But I think maybe both of you included in your briefs testimony of the various parties about was there a deed or wasn't there a deed? Correct. But what we did have is we had the HUD closing statement of when the property sold. When the property sold in Florida, and it's in the appendix of the brief, is the HUD closing statement that shows the owner, the seller of the house, as Tommy Cooper. And that was admitted? That was admitted. The other thing we have is the judge, we also had an issue of how do we divide up the capital gains because this was a rental house so they're going to have to pay capital gains on it. And the trial judge in an order entered August 27th stated the following, the property was deeded in Tommy's name alone and he may be subject to that income being reported in his name and the attendant tax liability. So the trial judge also makes a specific finding that the property is deeded in Tommy's name alone and the capital gains could flow to him. So we have the testimony which was a little contradictory. We have a HUD statement that's crystal clear. We have the original refinancings and the original purchase HUD statement that shows Tommy purchased it before the marriage. At the time of sale, Tommy's the sole owner. And we have the judge finding that Tommy's the sole owner. So I think based upon that, with Tommy not being on the deed, there's no way that we can find that it's been transmuted into a marital asset. We also raised in our appeal a question of the miscalculation of child support. This is our exhibit four and the basis on this one is merely computational errors on the part of the trial judge. And it's pretty simple. You can take a look at that. We have some things that were raised on the cross appeal and this is touching on the house again in Florida. When they sold it, it had been a rental house for 20 years. And so there were substantial cleanups and fix-ups that had to be made. They replaced carpeting. They repainted. It's in Florida so there was lots of woodwork indoors that had to be replaced. And then at the end, they actually sold it for a good price, had profits of about $185,000. But what the judge allowed Tommy to do was to deduct or pay himself back for the cost of the fix-up. And we have a stack of exhibits like that. It was not disputed that all of these repairs had to be made. And they have raised an issue on the cross appeal that Tommy shouldn't be allowed to take those deductions, that they should be dividing up the $185,000, which was the total sale proceeds, as opposed to $144,000, which is what the judge allowed him to do, deducting the fix-up expenses. And then the final issue that they raised on their cross appeal had to do with the trial court finding Diane in contempt. They had a house in Madison County, Detroit, and over two years ago, there was an order entered that the house is to be sold at auction before September 1, 2012. Well, Diane is still in the house. And we had issues of her not paying the mortgage on time, which was adversely affecting Tommy's credit report. The judge issued multiple orders, listed the house. She never listed the house, never put a sign in the front yard. And the trial judge's findings in that were pretty specific, that based upon all of the simple things that she had not done to frustrate the sale, he found her to be tapped into ward with some attorney's fees, which I think, under the evidence, was well supported. Thank you. Thank you, counsel. Thank you. Good morning. Good morning. May it please the court and Mr. Steiger, opposing counsel. My name is Nicole Carrion. I represent Diane Kubler in this matter, along with Mr. Mahan. She is the appellee and cross appellant. I believe Justice Schwarm raised a question with respect to the deed on the real estate that was in question. And I wanted to clarify and give you a little bit of a timeline with respect to this case so that you can better understand what evidence was actually produced and when. The original trial in this case occurred on September 6, 2011. It was a one-day trial, all remaining issues. On the date of the trial, the house had not been sold. And it was on that date that Tommy Kubler admitted during examination that the deed on the residence was transferred into their joint names. The parties were married. Now we're talking, I'm getting confused. We had two houses, not the rental house. She's talking about the residence house. This is the Florida property. Oh, the Florida. Okay, you're talking about Florida. Yes. So at the time of the original trial in September of 2011, the rental property in Florida had not been sold. It was still there. It was at that original trial that Tommy testified under oath that the deed was transferred into joint ownership with Diane's name on it. They refinanced. His testimony was that it was a technicality because of the refinancing. That refinancing first occurred in 1993, which is a year after their marriage. They got married in May of 1992. It was refinanced again in 2003, which Diane Kubler is also on that, was on that mortgage and note as well. Yeah, but I'm, we're talking about, you said the deed. Did you mean the deed and it's got her name on it? He could claim the property to her? No. The, at the original trial, Tommy never produced an actual deed. Right. He did, however, under examination, testify that the deed was transferred into their joint names. Now there's a mortgage. You sure that wasn't, you're not talking about the mortgage? I have the quotes directly. Okay. Cause I read mortgage in one of the briefs. Both. Um, this is from the record page 141. Um, in Tommy's direct examination on the day of trial, September 6th, 2011, this was Tommy's testimony. Question. You can answer Tommy. Did you have any reason other than refinancing to put Diane's name on that mortgage? Answer. No, sir. Question. At the time the new mortgage note was drawn, was there anything done with the deed listing of the property? Answer. The deed was adjusted to add her name to it. That was during his direct examination. Also during his cross-examination, and this is at lines, the record 273 lines, um, 5 through 21. Question. Well, you said you deeded it to her to reflect joint tenancy in 1993, correct? Are you recanting that testimony now, sir? Answer. I do not understand the nuance of deeding her a piece of property. Question. You put her name on the property. Answer. Okay? Question. Right? You put her name on the title of the property. Answer. Yes. And then lines 4 through 7 on the record, page 274, question. There is no question it is joint titled now. As you testify here today, the Florida house is jointly titled, correct? Answer. That is correct. Um, Diane also testified at trial when asked, and this is the record, page 348, lines 21 through 23. Question. Why was your name put on the deed to the Niceville property? Answer. Because we refinanced together, sir. So on the date of trial, September 6, 2011, Tommy did not produce any deed to show that it was entitled jointly. And he testified in fact that it was. The court ruled after that. And that was at a refinancing, is that correct? Correct. In 1993. The court, and then they were married from 92 until 2012. The court ruled in its order, March 5, 2012, that the Florida real estate was marital property. And that Tommy did not rebut the presumption by clear and convincing evidence. And the court specifically stated that there was sufficient evidence to find that it was marital property in the first place, even without getting into the rebuttable presumption. The law as it relates to that presumption is that any non-marital property transferred into some form of co-ownership between the spouses during the marriage is presumed to be marital property. That's N. Ray, the marriage of McCoy. The presumption may only be overcome by clear and convincing evidence to the contrary. The party claiming that the property is non-marital has the burden of proof. And that's N. Ray, the marriage of Maddox. Any doubts as to the nature of that property are resolved in favor of finding that the property is marital. That's N. Ray, the marriage of Eddie. And the court specifically found in its March 2012 order that he did not overcome that presumption. In fact, the trial court stated that not only did he not overcome the presumption by clear and convincing evidence, but he didn't even overcome it by a preponderance of the evidence. And the standard of review in this particular issue is of use of discretion. After the March 5, 2012 order was entered, Tommy didn't file any pleadings or motion to reconsider any post-trial motions or notice of appeal with respect to the judge's classification of it being marital property. It wasn't until a year later, in April of 2013, that the house was sold. And the HUD statement wasn't even introduced until the July hearing in 2013. So over a year later. And at that hearing, there was not a revisiting of the issue as to whether or not it was marital or non-marital. The issue at the July hearing was who should get what out of the equity or the proceeds of the sale. The house sold for $185,000. Tommy brought in exhibits requesting that he have more of the equity. Diane was wanting half of the equity. That was what was tried. It wasn't a retrial of whether or not it was marital. At that, the court ruled after that hearing, and actually I misspoke. The hearing was in May of 2013. In July of 2013, that's when the court's ruling was. And the court ruled that of the $185,000 from the proceeds of the sale, that the parties would split net proceeds of $144,979.23. The $144,979.23 is about a $40,000 difference from the actual proceeds of the sale of $185,000. In our cross appeal, we have argued that that was an inequitable division. In the court's actual order, Mr. Steiger mentioned in his statements that the $40,000 discrepancy was due to cost of repairs that Tommy had presented at trial. But the court's actual order doesn't actually mention those repairs. It doesn't mention- Is that the amount that he presented at trial? Correct. The difference? I believe that he presented a stack of- Bills. Bills. And the court doesn't reference in its opinion what that amount was. It doesn't even really reference. It just says the net is $144,979.23. And then the court equally divides that $144,000. Diane is asking that the court reverse that ruling and allow her to have an equitable division or half of the $185,678. A related issue, since we're on the Florida property that we raise in our cross appeal, is the tax liability issue. This Florida rental property appreciated the value that there was going to be some capital gains tax on it after the sale. There was $15,000 held in escrow, I believe, that was going to be used, or the idea was that it was to be used towards that tax liability. On the May 2nd, 2013 hearing date, the court ruled from the bench, and this is found on page 38 of the record, the judge ruled that wife, which is Diane, would only be responsible for any tax liability on her actual portion of what she received from the Florida property. And again, the court had ruled that she would receive half of $144,979.20. But then later, after another hearing date in July of 2013, the court in its final order on August 27th of 2013 changed that and stated that each party was to pay half of the total tax liability, which is different. The total tax liability is going to be on the $185,000 that it actually sold for. So we are asking that Diane's tax liability be- Now we're talking capital gains. Correct. But don't you take the expenses off of capital gains? Are you really coming off of $144,000? Well, we don't know the answer to that, and there's another reason for that as well. And then was it a portion that he had before, the percentage of time he owned it versus the percentage of time she and he allegedly owned it? Well, they were married. The court found that the net proceeds from the house is going to be $144,000 approximately, and that they each get half. That's what the order stated. We know that the house sold for approximately $185,000. Okay. So Tommy is essentially getting $40,000 more, and whether or not that was- Well, I thought that $40,000 was spent on improvements or fixing or whatever. If that is what the bills totaled, but there's nothing in the order to state that that's what it actually was, and there wasn't a lot of testimony on it. Were the bills put into evidence? I believe the same. So they were in the file. Yes. So essentially, our issue that we raised with respect to the tax liability is, if the August 27, 2013 order stands as is, she could potentially be required to pay half of the tax liability on the whole amount, including potentially Tommy's portion, instead of what it- That's what it said, half the tax liability. I'm confused. I'm sorry. She used to pay half? Half of the- The August 27, 2013 order states that she's to pay half of the tax liability on the sale of the rental property. The May 2013 order, which was entered prior to that August one, obviously, had stated that she would only be liable for half of the tax liability on her portion, which is different than the August- Half on her portion, so it's half of a half? Half on a half, correct. That was his original order. Since the final order had not been entered yet, and you're basically cross-appealing on this distribution of final order, the judge had jurisdiction to change his mind, basically, on that, didn't he? On the tax liability issue? Yes. It was still within his jurisdiction. It wasn't a jurisdictional problem like you've got the argument over the Scrivener's error. And in making a final order- Excuse me. Distributing everything and looking at the entire scope of this, it was within his discretion, if the evidence supported it, to change his mind, wasn't it? Yes. We are arguing in our brief that it's inequitable for him to give her more of a tax liability on a lesser portion. Basically, they are equally liable for the liability, although she's not receiving- Well, let me ask you this. Following on your argument that she actually was put on the deed as well as all the mortgages, why shouldn't she be liable for half of the capital gains on the house? Because she's receiving less of the equity. That's our argument. So the whole basis is inequitable distribution. Correct. Okay. Got it. I'm moving away from the Florida property unless there's any other questions. Okay. With respect to the Scrivener's error, the case, there's a Fifth District case, Ashline v. Barbell, that stands and holds that a trial court may modify its original judgment at any time, non pro tonque, based on a clerical error. The issue is whether or not the judge's error was clerical or if it involved some sort of judicial reasoning. The actual error that occurred was- Go ahead and you can get that one thought. The actual error that occurred was instead of 981.9, the judge stated that the decimal point was inadvertent and it was supposed to be 9981. Okay. Thank you. Do you have, as far as that, there's an argument that there was a miscalculation or misunderstanding of the evidence as to how much shares actually were existent. The one- I'm sorry. Will you address that, please? The one thing that is consistent between the judge's first order that was entered in March 2012 and his last, his second order in July of 2013, is that he found that the total amount of shares was 12,284. That was consistent between both companies. Thank you very much. Rebob? Thank you, Judge. Just to address a couple of things that Ms. Carrion just raised, this is not a decimal point and these numbers go by kind of quickly, so let me give them to you. The original order was 981.9, 9819. The new order was 9981, so this is not a missing decimal point that's added. The numbers are completely different and we're talking a factor of 10 times the number of shares. On the testimony of Tommy, that is correct. The problem we have with that is that the testimony was wrong. The HUD statement that we have, and we all know what HUD statements are, the HUD statement that we have for the sale of the Florida house shows Tommy as the sole owner of the property. The judge, in his final order, entered on August 27th. The trial judge found the property was deeded in Tommy's name alone. Those two findings, I think, control on whether or not Diane's name was added to the deed. The trial court made a finding that the deed was in Tommy's name alone, and I think that controls in terms of there not being a transmutation of the property. As you will see from looking through this file, it's a mess. We have trial date, trial date, order. We have an order. The final judgment entered on March 5th of 2012, and then we have another order at the very end of August, more than a year later. It is a very confusing procedural history, but I think on the basic things, on the issue of your decision on a de novo basis of changing the number, which the judge admits is a significant change in the order, was not a clerical error. That was judicial reasoning. That was the judge thinking, well, wait a minute. I got that number wrong. I need to change that number. And on a de novo review, I think the evidence well supports the finding that that was not a scrivener's error that the court had jurisdiction to make. Thank you, counsel. The case will be taken under advisement. You'll be notified in due course. Custle, we'll adjourn now until 1 o'clock. We don't have more cases. We'll adjourn until 1 o'clock. All rise.